AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: s/Nick Coffey 8/5/24

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  M-24- 605 -AMG |
| A iPhone 12, serial number DNPDXUDE0DXW, used by Matthew Alan Stacy, currently in the custody of the Oklahoma Bureau of Narcotics and Dangerous Drugs | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ **Western** _____ District of _____ **Oklahoma** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy | |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Sean Lively, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __8/8/24__

*Judge's signature*

City and state:  Oklahoma City, Oklahoma

Amanda Maxfield Green, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **In the matter of the search of iPhone 12, serial number DNPDXUDE0DXW, used by Matthew Alan Stacy, currently in the custody of the Oklahoma Bureau of Narcotics and Dangerous Drugs** | **Case No. M-24-    -AMG** |

### AFFIDAVIT IN SUPPORT
### OF SEARCH AND SEIZURE WARRANT

I, Special Agent Sean Lively, of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, depose and state as follows:

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search and seizure warrant authorizing the examination and seizure of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in **Attachment B.** I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to the High Intensity Drug Trafficking Area (HIDTA) Enforcement Group in Oklahoma City of the DEA

1

and have been so since February 3, 2020. Prior to my assignment with HIDTA, I attended the Basic Agent Academy Class in Quantico, Virginia. In addition, I have attended schools or trainings dedicated to drug investigations. Since becoming a Special Agent, I have been involved in a wide variety of investigative matters, including numerous investigations targeting large criminal enterprises, most of which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in many aspects of criminal investigations, including surveillance, applying for and executing search warrants, criminal and administrative arrests, and interviewing and debriefing defendants, informants, and other witnesses. I have also worked with other local and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. Through my training and experience, I have become familiar with some of the methods by which illegal drugs are imported, distributed, and sold, as well as the means used by drug dealers to disguise the source and nature of their profits. I have also received formal training in money laundering, and how criminal networks can layer assets purchased through illegal proceeds.

2.    I am submitting this Affidavit for the limited purpose of establishing probable cause to secure a warrant authorizing the search and seizure of  an Apple iPhone 12 cell phone, with device serial number

2

DNPDXUDE0DXW (the **SUBJECT PHONE**), belonging to **Matthew Alan Stacy** (**STACY**), which is in the possession of the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBN) in the Western District of Oklahoma, as further described in **Attachment A**, for evidence of violations of 21 U.S.C. § 846 (Drug Conspiracy), as described further in **Attachment B**, (description of items to be seized).

3.     Since this Affidavit is being submitted for the limited purpose of securing a search and seizure warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant. The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records.

## PROBABLE CAUSE

### Background of the Investigation

4.     In 2018, Oklahomans voted in favor of State Question 788, which authorized the State of Oklahoma's medical marijuana program ("Oklahoma's MMP"). Oklahoma's MMP created the comprehensive regulatory framework governing the cultivation and distribution of marijuana for medicinal purposes within Oklahoma.

3

5.    Marijuana manufacture and distribution remained illegal under Oklahoma law for those who did not abide by Oklahoma's MMP, including for those who did not legally obtain the proper commercial grower licenses and registrations with the State of Oklahoma. Similarly, Oklahoma's MMP limited marijuana possession to those holding medical marijuana licenses and restricted the amounts a license-holder could possess. Marijuana, of course, remained a Schedule I controlled substance under federal law; as such, its manufacture and distribution were prohibited by the Controlled Substances Act.

6.    Oklahoma's MMP was largely governed by the Oklahoma Medical Marijuana and Patient Protection Act, which set forth the legal requirements for persons seeking licenses to participate in the medical marijuana industry, including Oklahoma Medical Marijuana Authority ("OMMA") commercial grower licenses ("OMMA licenses"). Under the MMP, an individual could not own and operate a marijuana grow unless he or she had first received an OMMA license. At all relevant times, applications for OMMA licenses had to be complete and accurate in every detail, and all applications had to show that at least seventy-five percent (75%) of all members, managers, executive officers, partners, board members, or any other form of business ownership were Oklahoma residents.

7.    Prior to August 31, 2019, applicants for OMMA licenses could establish Oklahoma residency by providing proof of residency, such as an Oklahoma driver's license, a residential property deed, or a residential lease. On August 31, 2019, that requirement was modified to require the applicant to provide proof of Oklahoma residency for at least two years immediately preceding the date of application or five years of continuous Oklahoma residency during the 25 years immediately preceding the date of application.

8.    Additionally, all commercial growers were required to apply for and obtain a registration with the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control ("OBN registration") prior to commencing operation, i.e., growing marijuana.

9.    In the years following the passage of Oklahoma's MMP, the OMMA granted more than 9,000 commercial grow licenses. Many of these commercial grows were established fraudulently, with their owners making false representations on applications for OMMA licenses and OBN registrations. Sometimes the true owners falsely stated that they were Oklahoma residents. Other times, the true owners did not list themselves on these applications, instead listing third parties who had no relationship to or controlling interest in the grow operation. This "ghost-ownership scheme" resulted in numerous individuals, including illegal aliens and foreign nationals, as well as U.S. citizens of states other than Oklahoma, illegally

5

receiving OMMA licenses and OBN registrations and operating marijuana grows. In addition to being established fraudulently, many of these illegal marijuana grows supplied the black market, sending marijuana out of state.[1] Oftentimes, these "ghost owners" did not act alone in establishing these black-market grows, instead relying on real estate or legal professionals to help them evade Oklahoma's MMP requirements.

10. In late December of 2020, the DEA's Oklahoma City District Office, in tandem with the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBN), began a joint investigation into: (1) the proliferation of out-of-state and/or foreign organizations establishing marijuana farms in Oklahoma and subsequently distributing the drug out of the state and the country—in violation of both federal and Oklahoma law and (2) these grow operations' connections to other illegal activities, such as labor trafficking, bulk cash smuggling, unlicensed money remitter services, and conventional money laundering. As the investigation progressed, investigators also identified connections with other DEA cases throughout the country. In short, it appeared that DEA targets in other states—money launderers and drug traffickers had begun to funnel their money and criminal enterprises into

---

[1] Oklahoma Stat. tit. 63 §427.1, *et seq.*, dictates the "seed-to-sale" requirement in Oklahoma, namely that marijuana be grown in the state and then sold or transported to an Oklahoma license institution, such as an Oklahoma licensed dispensary.

Oklahoma to take advantage of Oklahoma's marijuana laws, which are notorious for having been poorly enforced.

11.    The investigation has shed light on a few aspects of Oklahoma's medical marijuana industry.  These observations are derived both from my personal investigation during the last few years and through conversations with state and other federal law enforcement officers.

12.    First, a large majority of Oklahoma marijuana grows, even those with OMMA licenses and OBN registrations, simply sell their marijuana on the black market rather than operating within the confines of Oklahoma's MMP.  Drug dealers have moved to Oklahoma to grow and sell marijuana on the black market, that is, to other states, often in contravention of the particular state's marijuana laws—all in violation of both Oklahoma and federal law.

13.    Second, individuals in control of these grow operations have employed schemes involving ghost-ownership and shell companies in order to conceal the true identities of the owners and managers of these marijuana grow operations.  In my training and experience, the true owners of a large share of these marijuana grow operations are not actually Oklahoma residents.  Many times, they are not even on site to oversee their marijuana grow operations, as they reside in other states and countries.

14.    As part of OBN's investigation, **STACY** was charged with approximately thirty-four felonies in connection to his licensing scheme, described in more detail below.  Specifically, **STACY** was charged with four (4) counts of manufacturing a controlled dangerous substance, one (1) count of trafficking a controlled dangerous substance, twenty-six (26) counts of offering a false or forged instrument for record, and one (1) count of a pattern of criminal offenses. *See State v. Stacy*, CF-2022-00251 (Garvin County). **STACY** has since moved to dismiss those state charges, arguing, among other things, that he did not knowingly and intentionally violate the law with intent to defraud and that his prosecution violates due process because he did not understand his conduct was illegal.   The state court has rejected those arguments.

15.    On April 2, 2024, the Federal Grand Jury sitting in the Western district of Oklahoma returned an indictment charging **STACY**, along with Chong Iu Phu, aka Alex Phu (PHU), Chanh Iu Phu, aka Shawn Phu (CHANH), with drug crimes, including drug conspiracy, in violation of 21 U.S.C. § 846.

***STACY's Scheme***

16.    **STACY** is an Oklahoma attorney who engaged in a conspiracy to fraudulently obtain OMMA licenses and OBN registrations on behalf of his clients, who wanted to establish medical marijuana farms.  Because Oklahoma law required any marijuana license to be at least 75% owned by an Oklahoma

8

resident, **STACY** would find an Oklahoma resident to list as this majority owner on applications with OMMA. He would then execute a separate agreement between the Oklahoma resident and the true owner (the non-Oklahoma resident) in which the Oklahoma resident received several thousand dollars in exchange for contracting all profits, proceeds, rights, and responsibilities to the non-Oklahoma resident. The intended effect was the Oklahoma resident became a straw owner, having no control over the marijuana farm for which his/her name was listed on the license.

17.     Testimony from Helen Carillo and her husband, Rafael Carillo, at **STACY's** preliminary hearing in state court was emblematic of how the scheme worked. According to the Carillos and documents introduced into evidence at the preliminary hearing, Helen Carillo, on or around June 1, 2020, agreed to be listed as the 75% owner of My Lien Green LLC, which applied for and was granted an OMMA license. Carillo served as the Oklahoma resident and 75% owner, while My Lien Huong, a non-Oklahoma resident, served as the 25% owner. **STACY** then had My Lien Green LLC execute a separate "Management Services Agreement" with a *separate* company My Lien Hong Green LLC—owned in full by My Lien Huong—wherein My Lien Green LLC assigned all rights to manage the marijuana grow to that entity and received 100% of all revenue from marijuana sales. The effect was, as Helen Carillo testified, that she never received a share of the profits and never oversaw or

9

managed any aspect of the grow's daily operation. In exchange, Carillo was to receive $5,000 per year for two years, with Carillo's name "falling off" once My Lien Huong had resided in Oklahoma for two years and could thus own a marijuana farm.

18.    The investigation has established that **STACY** used this scheme hundreds of times, often listing himself as the contact person for the marijuana grow, the **SUBJECT PHONE's** assigned call number (405-816-7228) (the "7228 number") as the contact number, the contact address as one of his law office locations, and the contact e-mail as Matt@stacylegalgroup.com. Additionally, **STACY** would list the -7228 number as the contact information for the reporting party to OMMA for several licenses.

19.    **STACY** does not dispute that this is how his "business structure" worked. *See, e.g., United States v. Matthew Alan Stacy, et al.*, CR-24-146-R, Defendant's Motion to Enjoin Prosecution, Doc. 67 (W.D. Okla. 2024) (explaining that "[i]n seeking licensure (OMMA) and registration (OBN) for its clients, Mr. Stacy's legal group employed an ownership structure by which the entity applying for licensure was separate from the entity managing the cultivation of marijuana"). Rather, **STACY** argues that this complied with Oklahoma law. The State of Oklahoma disagrees, however, as the Attorney General for the State of Oklahoma and the Oklahoma Bureau of Narcotics and Dangerous Drugs are jointly prosecuting **STACY** in Garvin County,

Oklahoma.  While **STACY** has raised arguments in his state case that he was in compliance with state law and, if he was not, he lacked fair notice that his conduct was prohibited, both the special judge and the district judge have rejected that argument.

20.    Carillo was not the only person **STACY** used as the Oklahoma resident on applications for OMMA licenses and OBN registrations.  He also listed Kylie Kennedy.  Kennedy testified at **STACY's** preliminary hearing that she had never met **STACY**, however.  Based on law enforcement's interviews with Kennedy, it appears she sold her personal information to PHU (**STACY's** co-defendant in the federal case), and it appears they passed clients back and forth, with **PHU** servicing some of the clients' real-estate needs while **STACY** handled licensing issues.  Records show that **STACY** submitted at least seven applications for either an OMMA license or OBN registration using Kennedy's personal identifying information, including an attachment of her Oklahoma ID.  On these applications, **STACY** is the listed contact person and uses the office phone number for Stacy Legal Group and/or matt@stacylegalgroup.com for the contact information.

21.    In interviews with Kennedy, she has reviewed several documents and affidavits bearing her signature that were submitted in support of various license applications.  In each instance, Kennedy has denied completing or authorizing her name to be placed on these applications for OMMA licenses.

Several of these OMMA applications are accompanied by operating agreements, wherein Kennedy is identified as the 75% owner, while others are identified as the 25% owner.  Kennedy reviewed operating agreements for several marijuana grows for which she was listed as 75% owner, specifically (1) Big Big Grow LLC; (2) H Green OK LLC; (3) STJ Holdings LLC; (4) ENJ Green LLC; (5) Yizhi Green LLC; (6) Okie Dream LLC; and (7) Xiao Wang Green LLC.  For each, Kennedy indicated she did not know the 25% owner.

22.    With the exception of Xiao Wang Green LLC, the other Operating Agreements specified above, include a signature, followed by the typed name of Matt Stacy as the "Incorporator by the Authority of Kylie Kennedy and [the 25% owner]."

23.    Additionally, in June 2024, investigators with DEA and OBN conducted an interview with CS1, an ex-employee of Stacy Legal Group.[2] CS1 informed investigators that that he/she recalled being told to place Carillo's name on multiple licenses during his/her years working for **STACY**. Specifically, CS1 stated that **STACY** would hand him/her documents and simply inform CS1 to put Carillo's personal information on the application. CS1 also explained that after **STACY** learned that law enforcement was

---

[2]    CS1 is cooperating with law enforcement in exchange for consideration on possible criminal charges. I am not aware of any criminal history for CS1 or any false information furnished by CS1.

investigating him for placing Carillo's name on a number of licenses, that he had every employee of his firm calling the true owners of the marijuana licenses to inform them that they needed to find a new individual to be their license holder.  CS1 stated that he/she recalled **STACY** utilizing Kennedy's name on marijuana licenses as well, but did not remember how many.  CS1 added that he/she also contacted additional individuals to be utilized on licenses by **STACY**, and that **STACY** on multiple occasions provided him/her approximately $2,000 to pay these individuals for each license they were placed on. Lastly, CS1 informed investigators that he/she believed that during CS1's early employment in Stacy Legal Group that he/she submitted a marijuana application for **STACY** almost every day, ultimately estimating approximately 200.  CS1 later explained that those 200 only included the initial applications that CS1 personally remembered submitting.  CS1 also believed that during his/her entire employment that he/she had helped prepare 400–500 OBN renewal applications.

### *Black-Market Grows*

24.    The investigation established that in addition to circumventing Oklahoma law's residency requirements to set up their marijuana farms, **STACY's** clients were also simply black-market marijuana traffickers—that is, they grew and distributed marijuana outside of Oklahoma's MMP.  What

follows are examples of black-market traffickers that **STACY** aided; this list is not exhaustive.

### A. CX Green LLC and Guan Green LLC

25.    On or about June 2020, **STACY** applied for a medical marijuana manufacturers registration with OBN, on behalf of CX Green LLC, located at 51978 West 201st Street, Depew, Oklahoma.    The application identified Crystal Huynh as the 100% owner of the business and **STACY** as the registered agent and contact person for this business.    The Certificate of Compliance submitted for this entity to OMMA in January 2021 listed Helen Carrillo and Guanrong Yang as the owners of the business.    432 South Mustang Road, Suite B, Yukon, Oklahoma (one of **STACY's** office locations) was listed as the mailing address, 405-819-7228 as the phone number, and matt@stacylegalgroup.com as the contact email.[3]

26.    On or about January 2021, Guan Green LLC applied for an OBN registration.    According to records provided by OMMA, Guan Green LLC submitted an Operating Agreement, dated September 2020, listing Helen Carrillo as the 75% owner and Guanrong Yang as the 25% owner of the entity. This application listed the same business location in Depew as CX Green LLC.

---

[3]    Based on the similarity between the **SUBJECT PHONE** (405-816-7228) and the submitted number (405-819-7228), I believe the submitted phone number is likely a scrivener's error and was intended to be the **SUBJECT PHONE**.

Affidavits of Lawful Presence, dated September 2020, were submitted by or on behalf of Yang and Carrillo to OMMA.

27.    In November of 2020, Arkansas law enforcement stopped Guanrong Yang with approximately 70 lbs. of marijuana.  Based on my training, experience, and knowledge of the investigation, I believe that Guanrong Yang was transporting marijuana from the Depew grow out of the state, to be sold on the black market, in violation of Oklahoma and federal law.

28.    On September 8, 2021, OBN executed a search warrant at the Depew Grow.  Guanrong Yang was present.  Law enforcement seized more than 3,000 marijuana plants and approximately 2,000 pounds of processed marijuana.  In an interview with law enforcement, Yang indicated that he was the owner of the marijuana grow.  Yang indicated that he did not know Crystal Huynh, he had never seen her, and she did not own any of the grow operation. OBN asked Yang to produce records for marijuana on the premises or previously harvested and he stated he had no records, in violation of Oklahoma law.

### B. Okmulgee Green and James Chen

29.    On August 26, 2021, OBN agents executed a search warrant at a marijuana grow, Okmulgee Green LLC, located at 17635 Gun Club Rd., Okmulgee, Oklahoma.  STACY was the listed primary contact person and registered agent for Okmulgee Green LLC on OBN and OMMA applications.

On these applications, **STACY** employed the ownership structure previously described, with James Chen—the out-of-state resident—identified as the minority owner. The search warrant on August 26, 2021, confirmed that this location was an operational marijuana grow with plants present at various stages of growth, including seedlings and mature plants which were ready for harvest. Further, the location had evidence of prior harvest(s).

 

30.     During this operation, OBN seized James Chen's cellphone. Agents subsequently obtained a search warrant approving the download of the device. This cellphone listed the **SUBJECT PHONE's** 7228 number as **STACY's** number. **STACY** has also listed the **SUBJECT PHONE's** 7228 number as his in correspondence with law enforcement.

31.     Text messages between the **SUBJECT PHONE's** 7228 number and Chen show **STACY** assuring Chen that he could grow marijuana despite *not yet having received an OBN registration. Based on evidence from the* search warrant, namely the presence of expended root balls and mature plants on the premises, this operation was unlawfully growing marijuana prior to

16

being issued any OBN registration.   Chen was interviewed during and subsequent to the warrant and stated that he hired **STACY** to facilitate the acquisition of a medical marijuana grow license for this location.   **STACY** utilized Helen Carrillo as the 75% owner of Okmulgee Green Holdings LLC. Chen indicated that he does not know, nor has he ever met, Helen Carrillo. Chen also testified at **STACY's** preliminary hearing, explaining that he and his partner, Cheng Lin, a Rhode Island resident, contacted **STACY** in September 2020 to inquire whether they could get an OMMA license despite being an out-of-state resident.   **STACY** said yes, so long as they had a "local partner," which he could "provide."  This local partner, **STACY** stated, would not have rights to profits from or control of the marijuana grow.

### C. Big Grasslands LLC

32.    On December 22, 2021, **STACY** used the **SUBJECT PHONE** to talk to Agent Velazquez while OBN agents were executing a search warrant at another illegally established marijuana grow, Big Grasslands LLC, at 11889 Albright in Jones, Oklahoma.

33.    During this conversation, **STACY** informed Agent Velazquez that he was the legal representative of the grow and that the OBN registration for this grow was at his office located at 432 South Mustang Road, Suite B in Yukon, Oklahoma. **STACY** further stated that the owner had merely failed to pick up the registration from his office. (In fact, no OBN registration existed

17

for this grow.) Despite not having an active OBN registration, the Jones grow was operational, in violation of Oklahoma and federal law. Further, OMMA records indicate that no reports of plants, processed marijuana product, or sales were received for this grow location or entity, which I know from training and experience is indicative of marijuana grows engaged in black-market activity.

### D. *Goodness Nature LLC*

34.     In January 2022, law enforcement conducted an undercover buy of five pounds of marijuana from CD1 and CD2, at 1383 SH 76, Blanchard, Oklahoma, the site of CD1's and CD2's marijuana grow, Goodness Nature LLC.[4] (There appear to be two addresses for this one location, with the other address being 28783 SH 76, Blanchard, Oklahoma.) These investigators negotiated for the sellers to transport an additional quantity of marijuana to Kansas, which subsequently led to the arrest of CD1 and CD2 on February 1, 2022, when the two were traffic stopped in Kansas with approximately 200 lbs. of marijuana.

35.     Then, on February 12, 2022, OBN executed a search warrant at Goodness Nature LLC and seized approximately 300 pounds of processed

---

[4]     CD1 and CD2 are both cooperating in consideration for their pending state charges in Kansas. CD1 does have a pending Oklahoma state charge from December of 2021 for unlawful possession of marijuana during a traffic stop in McClain County. I am aware of no false information furnished by CD1 or CD2.

marijuana and approximately 5,000 marijuana plants. Real property records, as well as statements from CD1 and CD2, established that **STACY** owned this real property and rented it to CD1 and his (CD1's) father, CD2, for $14,000 per month. STACY provided CD1 and CD2 the **SUBJECT PHONE** number as his contact number.

36. In later interviews with CD1 and CD2, the two reiterated **STACY's** and PHU's involvement. Specifically, CD1 and CD2 identified Andrea Sheung (one of Chong Phu's former employees) as the person who sent them to **STACY** to rent the Blanchard property while they waited for their marijuana farm in Cement, Oklahoma, to be built.

*OMMA Reporting*

37. As part of the investigation, agents have reviewed copies of the numerous reports that marijuana grow licensees are required create, maintain, and submit monthly to OMMA. In many of the reports submitted by grows connected to **STACY**, someone purporting to be **STACY** or Goldstar Compliance Group submitted the report.[5] On many occasions, OBN agents conducted search warrants or administrative inspections of marijuana grows that **STACY** either applied for or listed himself as the primary contact person

---

[5]    In text messages with James Chen, Stacy describes Goldstar Compliance as an "in-house compliance company we have that is taking care of many of my clients[.]"

for, at or near the time of the reports submitted to OMMA. Although these grows were clearly operational, no plants, sales, or marijuana product was disclosed in the reports. Additionally, many of these grows affirmatively reported they were not operational, however, when OBN agents entered the premises, marijuana was actively being grown and packaged.

38. For example, in June 2020, **STACY** reported that King Happy Farms LLC was not operational and further reported no marijuana plants, product or sales. That same month, agents executed a search warrant and seized approximately 14,000 plants. **STACY** was the listed registered agent for this grow. Similarly, in July 2020, **STACY** reported the OMMA licensee Ping Two LLC was not operational and had no marijuana plants, products or sales to report. That same month, OBN conducted an administrative inspection wherein they documented thousands of marijuana plants actively growing.

### Cell Phones

39. Based on my training and experience, I know that cellular phones such as the **SUBJECT PHONE** serve as communication devices, voice recorders, cameras, GPS navigation devices, and electronic calendars. Such cell phones and their associated memory cards commonly contain electronically stored information, including but not limited to, the phone directory and/or contacts list, calendar, text messages, e-mail messages, call

logs, photographs, and videos. In my training and experience, examining data stored on devices of this type can uncover, among other things, data and information which constitutes evidence, fruits, and instrumentalities of drug trafficking offenses and evidence that reveals or suggests who possessed or used the device.

40.    Furthermore, based on my training and experience, I know that it is very common for members of a drug conspiracy to use their phones for several reasons in the course of their criminal conduct. I am aware that individuals involved in drug conspiracies such as these often use cell phones to maintain contact with other co-conspirators, including growers, cultivators, license holders, traffickers, and suppliers. Additionally, I know these individuals also often exchange information about marijuana transactions/ facilities to include plant counts, weight of product sold, or information regarding the marijuana license itself. Similarly, I know individuals involved in this type of drug conspiracy often share pictures with their cellular phones of black-market marijuana and illicit proceeds received from the business. In this specific situation, I also know individuals conversed with **STACY** at the 7228 number (assigned to the **SUBJECT PHONE**) regarding their marijuana applications, the legality of their growing and selling of black-market marijuana, as well as the possible consequences they may face from law enforcement.

41.    On July 20, 2022, as part of the state investigation into **STACY**, OBN obtained a state search warrant for the **SUBJECT PHONE**. OBN agents subsequently seized the phone from **STACY** on July 21, 2022. OBN later turned the phone over to OSBI for analysis. Following the downloading of the **SUBJECT PHONE**, OSBI returned the device to OBN. It appears, however, that the electronic download of the **SUBJECT PHONE** is compromised or corrupted, as the DEA has not been able to access the contents of the download. Your affiant is thus seeking authorization to execute another download of the **SUBJECT PHONE**, which remains in OBN custody.

## CONCLUSION

42.    Based on the above information, there is probable cause to believe that violations of 21 U.S.C. § 846 (Drug Conspiracy) have occurred, and that evidence, fruits, and instrumentalities of these offenses are located on the **SUBJECT PHONE**. Therefore, I respectfully request that this Court issue a search and seizure warrant for the **SUBJECT PHONE**, described in **Attachment A**, authorizing the seizure of the items described in **Attachment B**.

Sean Lively
Special Agent
Drug Enforcement Administration

22

SUBSCRIBED AND SWORN to before me this _8th_ day of _August_, 2024.

AMANDA MAXFIELD GREEN
United States Magistrate Judge

## ATTACHMENT A

The property to be searched is Apple iPhone 12, with device serial number DNPDXUDE0DXW. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in this investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to custody and control of attorneys for the government and their support staff for their independent review.






## ATTACHMENT B

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of the crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 21, United States Code, Section 846:

1. All records on the **SUBJECT PHONE** described in **Attachment A** that relate to violations of 21 U.S.C. § 846 involving Matthew Alan Stacy (STACY), including:

   a. Lists of clients to whom **STACY** provided marijuana-related-business (MRB) services;

   b. Lists of co-conspirators and related identifying information;

   c. Records of communications with customers or co-conspirators, whether such communication be a telephone call, text message (e.g. SMS or MMS), instant message, or communication through an application store on the phone;

   d. Records detailing the agreements executed between **STACY** and his clients in furtherance of establishing or operating MRBs, as well as those agreements executed between the clients and third-parties in furtherance of establishing or operating MRBs;

1

e. Communications between **STACY** and his clients regarding potential legal consequences that could arise from operation of their MRBs;

f. Any audio recordings, pictures, video recordings, or still-captured images related to the purchase, sale, transportation, or distribution of controlled substances or the collection, transfer or laundering of drug proceeds;

g. All bank records, checks, credit card bills, account information, and other financial records; and

h. Any location data related to the acquisition of distribution of controlled substances.

2. With respect to the **SUBJECT PHONE** used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

2

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies,

3

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

The Prosecution Team expects that the **SUBJECT PHONE** may potentially contain materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"). A Filter Team of government attorneys and support personnel has been established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially

4

protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may begin its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team.

5